IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| GWENETTE JACKSON, | ) | CASE NO.  1:25-CV-00534-JRA |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE JOHN R. ADAMS |
| vs. | ) | UNITED STATES DISTRICT JUDGE |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | MAGISTRATE JUDGE |
| SECURITY, | ) | JONATHAN D. GREENBERG |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| | ) | |

Plaintiff, Gwenette Jackson ("Plaintiff" or "Jackson"), challenges the final decision of Defendant,

Frank Bisignano,[1] Commissioner of Social Security ("Commissioner"), denying her applications for Period

of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act,

42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under

Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge

recommends that the Commissioner's final decision be AFFIRMED.

## I. PROCEDURAL HISTORY

In January 2022, Jackson filed an application for POD and DIB, alleging a disability onset date of

February 13, 2021, and claiming she was disabled due to high blood pressure, left upper extremity

dysfunction, left wrist fusion, and depression.  (Transcript ("Tr.") 104.)  The applications were denied

---

[1] On May 7, 2025, Frank Bisignano became the Commissioner of Social Security.

initially and upon reconsideration, and Jackson requested a hearing before an administrative law judge ("ALJ"). (*Id*. at 110, 121, 128.)

On November 16, 2023, an ALJ held a hearing, during which Jackson, represented by counsel, and an impartial vocational expert ("VE") testified. (*Id*. at 37-72.) On January 17, 2024, the ALJ issued a written decision finding Jackson was not disabled. (*Id*. at 14-31.) The ALJ's decision became final on January 14, 2025, when the Appeals Council declined further review. (*Id*. at 1.)

On March 19, 2025, Jackson filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 6, 8, 9.) Jackson asserts the following assignment of error:

> (1) THE ALJ FAILED TO PROPERLY EVALUATE THE STATE AGENCY REVIEWER'S OPINIONS OF MS. JACKSON'S SOCIAL INTERATION LIMITATION AND THE MEDICAL SOURCE OPINION OF DR. HOCHMAN

(Doc. No. 6 at 7.)

## II. EVIDENCE

### A. Personal and Vocational Evidence

Jackson was born in 1971 and was 51 years-old at the time of her administrative hearing (Tr. 40, 44, 104), making her a "person closely approaching advanced age" under Social Security regulations. *See* 20 C.F.R. §§ 404.1563(d), 416.963(d). She has a high school education. (*Id*. at 29, 47.) She has past relevant work as a food service worker, final inspector, and inspector and packer. (*Id*. at 28-29, 52-53.)

### B. Relevant Medical Evidence[2]

On March 6, 2021, Jackson presented to Cultivate Counseling Consulting for mental health counseling. (*Id*. at 525.)

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

On October 13, 2021, Jackson presented for an office visit. (*Id*. at 493-4.) She had "nerve symptoms", was diagnosed with impingement syndrome, and received a corticosteroid injection. (*Id*. at 495.) On examination, the provider noted 4/5 strength on the left side and "intrinsic weakness" in her fingers on her left hand. (*Id*. at 494, 597.)

On January 28, 2022, Jackson presented for an office visit due to left shoulder pain. (*Id*. at 480.) On examination, the provider noted 4/5 strength on the left side. (*Id*. at 482.)

On February 15, 2022, Jackson presented for physical therapy. (*Id*. at 474.) Jackson reported shoulder pain worsening when she reaches out from her body, raises her arm overhead, putting on a coat, and lifting objects such as her purse. (*Id*.) The provider indicated strength of her upper left extremity ranged between 4- to 4+ out of 5. (*Id*. at 476.)

On March 4, 2022, Jackson presented for physical therapy. (*Id*. at 467.) She reported her shoulder improving, having less pain when raising her arm overhead, and sharp pain when reaching behind her. (*Id*.) She rated her pain at a one out of ten. (*Id*.)

On April 20, 2022, Jackson presented for physical therapy. (*Id*. at 448.) She reported minimal symptoms and no pain. (*Id*.)

On June 10, 2022, Jackson presented for an office visit. (*Id*. at 435.) She reported no shoulder pain and thought physical therapy was helpful. (Id.) She reported continued wrist pain. (*Id*. at 437.)

On September 21, 2022, Jackson presented for a mental health counseling session. (*Id*. at 516.) She was tearful as she had just received bad news regarding her mother's health. (*Id*.) The therapist provided techniques to assist in decreasing anxiety. (*Id*.)

On September 23, 2022, Jackson presented for a "workers comp consultation" related to left wrist pain. (*Id*. at 555.) She was referred to therapy to help the wrist pain and scar. (*Id*. at 558.)

3

On October 10, 2022, Jackson presented for occupational therapy. (*Id*. at 549.) Jackson complained of pain in her left hand. (*Id*.) She confirmed her ability to perform activities of daily living but stated some things like cutting with a knife and holding a phone, are painful. (*Id*.) The provider noted she is "limited in daily activities such as cutting meat and opening jars/cans and bottles" and "may benefit from skilled OT intervention to maximize independence". (*Id*. at 551-52.)

On December 21, 2022, Jackson presented for a mental health therapy appointment. (*Id*. at 514.) She started a medication for anxiety because she started having panic attacks after her mother died. (*Id*.)

On January 25, 2023, Jackson presented for an occupational therapy evaluation. (*Id*. at 534.) This visit was following surgery for "revision resection of keloid and scar left wrist." (*Id*.)

On January 31, 2023, Jackson presented for physical therapy. (*Id*. at 527.) A grip test revealed she could grip on average 70 pounds on her right side and 35 pounds on her left side. (*Id*. at 528.) A pinch test revealed she could pinch on average 13 pounds on her right side and 8 pounds on her left side. (*Id*.)

On March 10, 2023, Jackson presented for an office visit. (Id. at 532.) Her surgical incision appeared "well healed". (*Id*.) The provider noted she is in "voc rehab" and she stated she is "permanent light duty." (*Id*.) The provider wrote, "I will make her MMI [maximum medical improvement] for the keloid excision and she will be back at previous work level." (*Id*.)

On April 26, 2023, Jackson presented for a psychological evaluation. (*Id*. at 610.) A mental status examination revealed linear thought content, somewhat restricted affect, no signs of depression, some overt signs of anxiety, and no hallucinations or delusions. (*Id*. at 613.) She performed average on most cognitive tests and her mental status intelligence was estimated to be "low average". (*Id*. at 613-14.) She was diagnosed with Persistent Depressive Disorder, Social Anxiety Disorder, and Other Specified ADHD. (*Id*. at 614.)  The provider found Jackson's ability to understand, remember, and carry out simple instructions is similar to other adults of the same age; she had average comprehension; memory was average; her ability

4

to maintain attention and concentration was average; her ability to follow multi-step tasks appeared to be somewhat impaired for her age; ability to relate to others is somewhat impaired; relationships with co-workers and supervisors are "fair"; and her ability to withstand mental stress and pressures of work activity "appears to be at least somewhat impaired at this time". (*Id*. at 615-16.)

On September 19, 2023, Jackson presented for an initial evaluation. (*Id*. at 644.) On examination, Jackson had tenderness over the left wrist, hypersensitivity over a dorsal scar, discomfort over the ulnar aspect of the wrist, limited range of motion, and some paresthesia. (*Id*.) Diagnoses included "Left TFCC tear", "left lunotriquetral ligament tear", and "left wrist sprain". (*Id*.) The provider, Dr. Hochman, noted tightness around the left elbow, deltoid, and trapezius, and difficulty with range of motion of the left shoulder. (*Id*.) She was prescribed two medications, referred to physical therapy, and indicated she will do her best to remain productive at work. (*Id*. at 644-45.)

On November 7, 2023, Dr. Hochman completed a Medical Source Statement of Ability to do Work-Related Activities form. (*Id*. at 666.) He indicated Jackson could occasionally life and carry up to five pounds; could occasionally reach overhead and all other directions, handle, finger, and feel with the left hand; could occasionally push/pull up to five pounds with the left hand; could never crawl or work around vibrations; and would be off task twenty-five percent or more of the workday. (*Id*. at 666-70.) To support his opinion, Dr. Hochman cited decreased range of motion, "N/T", and "see medical". (*Id*. at 667.)

**C.  State Agency Reports**

**1.  Mental Impairments**

On October 4, 2022, psychologist Jennifer Swain reviewed the claim file and found there was "insufficient evidence to evaluate the claimant's conditions or limitations" despite attempts to contract the claimant. (*Id*. at 107.)

On May 22, 2023, on reconsideration, Katherine Fernandez, Psy.D., wrote, "[t]here is new and material evidence or there are changed circumstances affecting the findings. The ALJ's PRTF is not being adopted because current evidence shows additional impairments and limitations as compared to the initial level PRTF." (*Id*. at 115.) Dr. Fernandez opined Jackson had moderate limitations in understanding, remembering, or applying information, interacting with others, concentrating, persisting or maintaining pace, and adapting or managing oneself. (*Id*.)

### 2. Physical Impairments

On August 12, 2022, Indira Jasti, M.D., reviewed the claim file and opined Jackson could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, and sit or stand about six hours in an eight-hour workday. (*Id*. at 108.) Dr. Jasti noted postural limitations due to shoulder impingement syndrome, arthritis in both knees, and pelvic pain due to uterine fibroids. (*Id*.) Dr. Jasti opined Jackson could frequently climb ramps and stairs, never climb ladders, rope, or scaffolds, occasionally kneel and crouch, and never crawl. (*Id*.) Dr. Jasti noted manipulative limitations, and opined Jackson is limited on the left side in reaching overhead, handling, and fingering. (*Id*.) Dr. Jasti noted no visual or communicative limitations but did opine Jackson should "avoid all exposure" to hazards. (*Id*. at 109.)

On January 16, 2023, on reconsideration, Gerald Klyop, affirmed Dr. Jasti's findings. (*Id*. at 118.)

## D. Hearing Testimony

During the November 16, 2023 hearing, Jackson testified to the following:

> • She lives by herself part time and her adult son lives with her part time. (*Id*. at 45.) She can bathe and dress herself and prepare meals. (*Id*.) She does her own laundry, yet later testified her son sometimes helps pull wet clothes from the washer or she exclusively uses her right arm. (*Id*. at 46, 56-57.) She can drive and after about 25 miles her left arm bothers her. (*Id*.) She does her own grocery shopping. (*Id*. at 46.) Her son helps her with certain things around the house, like opening jars. (*Id*.)
>
> • She estimates she can lift five to eight pounds on her left side and about twenty-five to thirty pounds on her right side. (*Id*. at 46.) She is right-handed. (*Id*. at 60.) She sometimes "overworks" her left arm resulting in a

6

pinched nerve in her shoulder. (*Id*. at 53.) When her ulnar nerve is pinched it is very painful. (*Id*.) The pain "brings on depression". (*Id*. at 54.) Her job is also emotionally draining sometimes. (*Id*.) She takes time off to physically and mentally rest. (*Id*.) She later testified she could only lift eight pounds with both arms together. (*Id*. at 55.) She experiences shooting pain in her hand and has a painful surgical scar on top of her hand that is very sensitive. (*Id*. at 59.)

• She sees a counselor monthly and takes medication to treat her depression. (*Id*. at 57.) The medication and counseling help. (*Id*.) She does not experience side effects from these medications. (*Id*. at 58.)

• She has had cortisone shots to treat her shoulder and physical therapy. (*Id*. at 56.) She can no longer receive cortisone shots. (*Id*.) She takes medication to help with the nerve problem, but it makes her sleepy, so she takes it in the evening. (*Id*.)

• She graduated from high school and is currently working for a behavioral health company, assisting kids and adults with emotional issues. (*Id*. at 47.) She does not think she can do the job long-term because it is too emotional, and the kids are physically unpredictable. (*Id*. at 58-9.) She previously worked for a healthcare company, assisting a nonverbal autistic girl. (*Id*. at 48.) She lifted about eight to ten pounds during that employment. (*Id*. at 49.) She previously worked as an inspector and packer for a foam insulation company. (*Id*.) She estimates lifting or carrying up to forty pounds there. (*Id*.) She also previously worked as an assembly line inspector. (*Id*. at 49-50.) She estimates lifting or carrying up to forty pounds during her job there. (*Id*. at 50.) She previously worked as a food service worker, and estimates she had to lift or carry up to thirty pounds. (*Id*.)

• On a typical day when she is not working, she meditates, exercises by walking or taking a step class at the gym, and helping her adult children care for her grandchildren. (*Id*. at 54-55.)

The VE testified Jackson had past work as an Inspector and Packer, Final Inspector, and Food Service Worker. (*Id*. at 64-5.) The ALJ then posed the following hypothetical question:

With any hypothetical, I do want you to assume somebody of Ms. Jackson's age, education, as well as that vocational background. Now, the first hypothetical individual would be at the light exertional range. She would have the following additional limitations, in that she could frequently push, pull, and operate hand controls with the non-dominant left upper extremity. Never climb ladders, ropes, or scaffolds, as well as never crawl. Now, this individual could occasionally climb ramps and stairs, as well as occasionally kneel and crouch. She could occasionally reach overhead, frequently reach in all other directions, as well as frequently handle and

7

> finger with the non-dominant left upper extremity. She could have occasional exposure to extreme cold and vibrations, and would need to avoid all exposure to hazards, such as unprotected heights, dangerous moving mechanical parts, and commercial driving. Now, this individual would be limited to performing simple, routine, repetitive tasks, but would not, again, not be able to perform tasks which required a high production rate pace. For example, such as assembly line work. Now, she could have customary interaction with supervisors, but would be limited to occasional interaction with coworkers, and the general public. Now, lastly, this individual could respond appropriately to occasional change in a routine and relatively predictable work setting, but those changes would need to be easily explained and/or demonstrated in that they have some gradual implementation. Would that hypothetical individual be able to perform any of the Claimant's past work?

(*Id*. at 65-6.)

The VE testified the hypothetical individual would not be able to perform Jackson's past work.  (*Id*. at 66.)   The VE further testified the hypothetical individual would also be able to perform other representative jobs in the economy, such as Merchandise Marker, Mail Sorter, and Routing Clerk. (*Id*. at 67.)  The ALJ asked, "[n]ow, keep in mind, there are no limitations with the dominant right upper extremity, but for the second hypothetical, I'm reducing reaching in all directions with the non-dominant upper extremity to occasional. What impact would that have on those light jobs you just listed? (*Id*.) The VE responded, "[t]hat would preclude those light jobs, as well as any other light job in the national economy based on the other elements of your hypothetical." (*Id*.) The ALJ asked:

> Now, going to hypothetical number three, I want to circle back to the original hypothetical, so let's go occasional reach overhead, frequently reach in all other directions, non-dominant left, but this time I'm reducing handling and fingering with that non-dominant left upper extremity from frequent to occasional. What impact would that have on the jobs you previously identified?

(*Id*.) The VE stated, "Again, that would preclude the jobs I previously identified, as well as any other light unskilled jobs based on the other elements of your hypothetical." (*Id*. at 67-8.) The ALJ asked, "[n]ow, as my fourth hypothetical, I again want to circle back to the first hypothetical with all the original limitations,

8

except the individual is reduced to sedentary work. Now, at least prior to obtaining age 50, would there be sedentary unskilled jobs for that hypothetical number four?" (*Id*. at 68.) The VE responded, yes, the hypothetical individual could work as a Document Preparer, Circuit Board Assembly Screener, and an Addresser. (*Id*.) The ALJ asked, "[n]ow, what would happen to those positions if I, again, reduced reaching in all directions to occasional with left upper extremity?" (*Id*.) The VE stated that would preclude these jobs as well as any other job at the sedentary unskilled level. (*Id*.) The ALJ asked, "[a]nd as my sixth hypothetical, what if I went back to original reach, but reduced handling and fingering to occasional left upper extremity. What impact would that have on those sedentary jobs?" (*Id*.) The VE testified that "would preclude those sedentary jobs as well as any other sedentary job at the unskilled level, in my opinion." (*Id*. at 69.)

### III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if the claimant: (1) had a disability; (2) was insured when the claimant became disabled; and (3) filed while the claimant was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4)*, 416.920(a)(4). See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that they are not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the claimant must show that they suffer from

a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c), 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent the claimant from doing their past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent the claimant from doing their past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, Jackson was insured on the alleged disability onset date, February 13, 2021, and remains insured through December 31, 2024, the date last insured ("DLI"). (Tr. 103.) Therefore, in order to be entitled to POD and DIB, Jackson must establish a continuous twelve-month period of disability commencing between these dates. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2024.

2. The claimant engaged in substantial gainful activity during the following periods: April 2023 through June 2023 (20 CFR 404.1520(b) and 404.1571 et seq.).

10

3.  There has been a continuous 12-month period during which the claimant did not engage in substantial gainful activity. The remaining findings address the periods the claimant did not engage in substantial gainful activity.

4.  The claimant has the following severe impairments: traumatic tear of triangular fibro-cartilage complex (TFCC) of left wrist and complete tear of ulnocarpal ligamentous complex of left wrist, status post TFCC repair and left wrist fusion, left wrist keloid; left carpal tunnel syndrome and left ulnar nerve lesion; left shoulder impingement syndrome; bilateral knee osteoarthritis; depressive disorder; anxiety disorder; attention deficit hyperactivity disorder (ADHD) (20 CFR 404.1520(c)).

5.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

6.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) with certain restrictions. Specifically, the claimant can frequently push, pull, and/or operate hand controls with the non-dominant left upper extremity; she can never climb ladders, ropes or scaffolds and can never crawl; she can occasionally climb ramps and stairs, and can occasionally kneel and crouch; she can occasionally reach overhead and frequently reach in all other directions with the non-dominant left upper extremity; she can frequently handle and finger with the non-dominant left upper extremity; she can have occasional exposure to extreme cold and vibrations; she must avoid all exposure to hazards such as unprotected heights, dangerous moving mechanical parts, and commercial driving; she can perform simple, routine and repetitive tasks, but cannot perform tasks which require a high production rate pace (for example, assembly line work); she can have customary interaction with supervisors, but is limited to occasional interaction with coworkers and the general public; and, she can respond appropriately to occasional change in a routine and relatively predictable work setting, where any such changes are easily explained and/or demonstrated in advance of gradual implementation.

7.  The claimant is unable to perform any past relevant work (20 CFR 404.1565).

8.  The claimant was born on November 20, 1971 and was 49 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563).

9.  The claimant has at least a high school education (20 CFR 404.1564).

10. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the

claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

11. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

12. The claimant has not been under a disability, as defined in the Social Security Act, from February 13, 2021, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 17-30.)

## V.  STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence

12

could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### A.  Opinion Evidence

In her sole assignment of error, Jackson argues the "ALJ failed to properly evaluate the state agency reviewer's opinions of Ms. Jackson's social interaction limitation and the medical source opinion of Dr.

13

Hochman." (Doc. No. 6 at 7.) Jackson contends the ALJ failed to properly consider the supportability and consistency of both Dr. Fernandez's and Dr. Hochman's opinions. (*Id*. at 8, 12.) Jackson states the ALJ found Dr. Fernandez's opinion "only partially persuasive" because the record did not support the findings (*Id*. at 7, 8.) Jackson argues Dr. Fernandez's limitations are supported by "significant mental health history" including diagnoses of depression, anxiety, and ADHD as detailed by Dr. Magleby and Counselor Bedell. (*Id*. at 9-10.) Jackson claims "the record has strong supportability of [Dr. Fernandez's] 'superficial interactions' limitation." (*Id*. at 10.) Jackson states there is consistency within the record to support Dr. Fernandez's opinion and the ALJ failed to explain why the opinion was not adopted. (*Id*. at 11.)

Jackson contends the ALJ similarly erred in finding Dr. Hochman's opinion unpersuasive by failing to consider the supportability and consistency of his opinion. (*Id*. at 12.) Jackson argues the ALJ failed to analyze how the record was inconsistent with his opinion. (*Id*. at 13.) Jackson states Dr. Hochman's own records as well as physical therapy records support his opinion, and "there is consistency within the record to support Dr. Hochman's medical assessment." (*Id*. at 13-15.)

The Commissioner responds substantial evidence supports the ALJ's RFC finding. (Doc. No. 8 at 4-5.) The Commissioner states the ALJ properly considered Jackson's performance of her jobs that required significant interaction with others, despite it taking a toll on her mentally, her ability to work at substantial gainful activity levels as a house manager for a non-verbal autistic girl, and her part-time work at the behavioral health center caring for "troubled individuals". (*Id*. at 6.) The Commissioner contends the ALJ properly weighed such evidence, and concluded that Jackson could have customary interactions with supervisors but occasional interactions with coworkers and the general public, rather than the brief, superficial interactions found by Dr. Fernandez. (*Id*. at 7.)

Regarding Dr. Hochman's opinion, the Commissioner contends the ALJ's unpersuasive finding is properly supported because Dr. Hochman overstated Jackson's physical limitations, offered no explanation

for his findings, did not account for Jackson's ability to use her right dominant extremity. (*Id*. at 7-8.) The Commissioner contends Dr. Hochman offered no support, and neither did the record, for his finding that Jackson would be off-task twenty-five percent of the workday, even after acknowledging Jackson was working during his examination of her. (*Id*. at 8.) The Commissioner states that some of Dr. Hochman's limitations were included in the RFC and Jackson is improperly asking the Court to reweigh evidence. (*Id*. at 9.)

In her reply brief, Jackson claims the Commissioner reiterated the ALJ's reasoning as it related to Dr. Fernandez's opinion and offered no analysis. (Doc. No. 9 at 1-2.)

Since Jackson's claim was filed after March 17, 2017, the Social Security Administration's new regulations ("Revised Regulations") for evaluation of medical opinion evidence apply to this claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 404.1520c.

Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." 20 C.F.R. § 404.1520c(a). Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1) supportability;[3] (2) consistency;[4] (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment

---

[3] The Revised Regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1).

[4] The Revised Regulations explain the "consistency" factor as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2).

15

relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements.  20 C.F.R. § 404.1520c(a), (c)(1)-(5).  However, supportability and consistency are the most important factors.  20 C.F.R. § 404.1520c(b)(2).

The Revised Regulations also changed the articulation required by ALJs in their consideration of medical opinions.  The new articulation requirements are as follows:

> (1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

> (2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

> (3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical

16

opinions or prior administrative medical findings in your determination or decision.

20 C.F.R. § 404.1520c(b)(1)-(3).

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.,* No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019) (quoting 20 C.F.R. § 416.920c(a), (b)(1)).  A reviewing court "evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Id.*

The ALJ analyzed the opinion of Dr. Fernandez as follows:

> The State Agency medical file consultant who reviewed the psychological aspects of the claim found that the claimant could perform simple, repetitive and routine tasks with uncomplicated instructions in a structured, predictable work setting without production quotas, and only brief superficial interactions with supervisors and the public (B5A). I find this only partially persuasive as the limitation to 'brief and superficial' interactions is not fully supported. The claimant has been working in a setting that requires significant interaction with others. Although she reports that this takes a toll on her mentally, she has been able to continue performing. Nevertheless, I have accounted for the claimant's statements and provided for limited interaction. However, the terms utilized by the medical file consultant are not well defined and are not vocational terms; thus, I have modified the limitations regarding the claimant's social interaction to only occasional regarding coworkers and the public.

(Tr. 28.) The ALJ analyzed the opinion of Dr. Hochman as follows:

> Looking first to the opinions pertaining to the claimant's physical functioning, I have reviewed an assessment completed by Todd Hochman MD, the claimant's occupational medicine physician with whom she began seeing in September 2023 (B10F and B11F). Dr. Hochman opined that, based on the condition of the claimant's left upper extremity, she can lift/carry only up to five pounds occasionally, can occasionally reach, handle, finger, and feel with the left upper extremity, and can never crawl. He further opined that the claimant can never be exposed to vibrations. Finally, Dr. Hochman stated that the claimant would likely be off task more than 25% of the workday. I do not Dr. Hochman's overall opinion

17

persuasive as the limitations overstate the claimant's limitations and are not wholly supported. Regarding the limitation to only occasionally lift, carry, push, and/or pull up to five pounds, this overstates the claimant's limitations. Physical examinations document some reduced strength in the left upper extremity, but not to this level of severity. The majority of the tested muscles in the left upper extremity are noted to have 4 to 4+ strength out of 5. Furthermore, this limitation does not account for the claimant's ability to utilize her right dominant upper extremity, which is not limited. I also do not find Dr. Hochman's opinion that the claimant would be off-task 25% of the work day persuasive. There is nothing in the record to suggest such a limitation. The claimant independently manages her activities of daily living, she is able to drive, grocery shop, perform light household chores, and hold a part-time job. Even when considering her mental health treatment notes there are no indications of such a limitation. Based on the above, I do not find Dr. Hochman's opinion persuasive. While the overall record does support some his opined limitations, the overstated restrictions render his opinion unpersuasive.

(*Id*. at 27.)

Supportability and consistency are the most important factors under the new regulations for evaluating medical source opinions. 20 C.F.R. § 404.1520c(a). The ALJ considered the supportability and consistency of Dr. Fernandez's opinions, discussing how "the limitation to 'brief and superficial' interactions is not fully supported" as Jackson has been working in positions that requires "significant interaction with others". (Tr. at 28.) The ALJ's decision recognized her work at both Caring Angels and Peter James Behavioral Health, which Jackson testified consisted of working with a nonverbal autistic girl and "troubled individuals". (*Id*. at 17, 47-49.) The ALJ explained he considered Jackson's testimony that her work takes a toll on her mentally, and yet, she has been able to continue working in roles that require significant social interaction. (*Id*. at 28) The ALJ clarified he accounted for Jackson's testimony in the RFC, limiting Jackson's interaction to "only occasional regarding coworkers and the public." (*Id*.)

Jackson argues the ALJ "must explain why a medical source opinion was not adopted if their determination conflicts with a medical source opinion", that the ALJ failed to explain why he rejected Dr. Fernandez's opinion, and claimed the ALJ "adopted his own opinion." (Doc. No. 6 at 11.) However, the

ALJ is not required to base his RFC on the opinion of a physician. "[T]he ALJ is charged with the responsibility of determining the RFC based on her evaluation of the medical and non-medical evidence . . . to require the ALJ to base her RFC finding on a physician's opinion, would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability . . ." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013), citing SSR 96–5p, 1996 WL 374183 (July 2, 1996); *see also Shepard v. Comm'r of Soc. Sec.*, 705 Fed.Appx. 435, 442–43 (6th Cir. 2017) (rejecting the argument that "the ALJ's [residual functional capacity] lacks substantial evidence because no physician opined that [the claimant] was capable of light work"). Here, the ALJ included citations to evidence supporting his finding Dr. Fernandez's opinion "partially persuasive"; it was not a "cursory rejection" as Jackson claims, but an appropriate weighing of evidence. (Tr. at 28.)

The ALJ considered the supportability and consistency of Dr. Hochman's opinion, discussing how Dr. Hochman's limitation to only occasionally lift, carry, push, and/or pull up to five pounds is wholly inconsistent with other medical sources that document "some reduced strength in the left upper extremity, but not to this level of severity." (*Id.* at 27.) The ALJ cited medical records indicating strength tests revealed Jackson has "4 to 4+ strength out of 5" in her left upper extremity. (*Id.*) The ALJ noted Dr. Hochman failed to consider Jackson's ability to utilize her right arm, which is unlimited. (*Id.*) The ALJ also found Dr. Hochman's opinion that Jackson would be off task 25 percent of the day unpersuasive because "there is nothing in the record to suggest such a limitation." (*Id.*) The ALJ went on to state that Jackson "independently manages her activities of daily living, she is able to drive, grocery shop, perform light household chores, and hold a part-time job", and that even her mental health treatment notes do not indicate such a limitation. (*Id.*)

Jackson argues there is "a surplus of clinical evidence" to support Dr. Hochman's opinion. (Doc. No. 6 at 15.) Here, the ALJ wrote nearly six single-spaced pages considering Jackson's medical evidence.

19

(Tr. 23-28.) While Jackson would weigh the evidence differently, it is not for the Court to do so on appeal. See *Her*, 203 F.3d at 389-90. It is the ALJ's job to weigh the evidence and resolve conflicts, and he did so here. Substantial evidence supports the ALJ's determination. *Rogers*, 486 F.3d at 241.

There is no error.

## VII. CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

Date: February 13, 2026

        *s/ Jonathan Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

## **OBJECTIONS**

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).**